UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                                          :

     v.                                                 : Crim. No. 21-CR-367 (RDM)

MARK MIDDLETON                                    :

## INITIAL MEMORANDUM IN AID OF SENTENCING[1]

COMES NOW Defendant, Mark Middleton, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, and submits the following Memorandum in Aid of Sentencing.  Defendant argues herein that under the unique circumstances of his case, a sentence of home confinement, followed thereafter by a period of supervised release and an order of restitution, would constitute a sentence that is sufficient, but not greater than necessary, to accomplish the goals enumerated in 18 U.S.C. § 3553(a).

### *Introduction*

Although men and women of character try to do their best to be fair in their judgments of others, despite their best efforts it is often extremely challenging to filter out inherent prejudices and biases toward those who see the world very differently.

This is one such situation.

Undersigned counsel represented two individuals charged with crimes arising out of the Women's March on January 21, 2017, following the election of the former

---

[1] Undersigned counsel sincerely apologizes to the Court for the lateness of this submission.  Unfortunately, he ran into a scheduling gauntlet of deadlines to submit sentencing memoranda, including in other complex cases involving at least one defendant who was incarcerated.  In addition, he has had to deal with a myriad other deadlines in other cases relating to the filing of time-sensitive motions and responses.  Counsel works seven days a week, but seven days do not seem to be enough sometimes.

president.  Those charges were eventually dismissed, but the memory of the event has never disappeared.  Most of the people who marched in 2017 did not realize that some among them were going to engage in violent behavior, yet they were condemned in the press and in court filings as if they had somehow participated in or condoned the smashing of large plate-glass windows at banks and at a Starbucks, or been involved in the setting on fire of police cars.

Mr. and Mrs. Middleton were not involved in any destruction of property on January 6, 2021.  They never set anything on fire, smashed any windows, stole any government property, or sprayed officers with chemical spray or tear gas.

In fact, they never even entered the Capitol on January 6, 2021.  And up until they were physically struck by the bike racks purposefully pushed into them by the police that afternoon, they were huddled together in prayer, feet away from those bike racks.

As the images below show, the Middletons were not facing the officers or the bike racks, but were rather looking at each other.

This is clear proof that unlike some others, they were not attempting to advance past the police line, or overcome the barricades the police were using.  They were literally just standing there, hugging and praying.

The police surely wanted to move the crowd back, but the Middletons never moved toward the police, as these two photos clearly show.





And while their political views are very different than the views of many who live in the Washington, D.C. metropolitan area and who marched to protest the election of the former president in 2016, counsel asks this Court, as it views its sentencing obligations in this case, to imagine that the Middletons were Democrats on January 6, 2021, Democrats who were on the Capitol grounds (however illegally) that day to express their views about someone (such as the former president) whose actions and words they abhorred (such as the former president).

When viewed in that context, counsel submits that the interaction between the police and the Middletons would be evaluated very differently.  That is because the evidence showed that the Middletons never attacked the police or even touched them before the police pushed bike racks into them and others near them.  Only after the police engaged in this behavior did the Middletons have any physical contact with the police whatsoever.  And that contact did not consist of any punching, shoving, or any other action intended to injure any officer.

While the video recordings are not, unfortunately, completely clear as to what happened between the Middletons and the police, they do show that the police were the ones to initiate violent contact with the Middletons.

The videos also show that others in the crowd, enraged by the aggressiveness of the police, used flagpoles to try (almost invariably unsuccessfully) to hit back at the police.



The videos that counsel has carefully reviewed do not show Mr. Middleton

striking any police officer with his small flag (which cannot be accurately described as a

flagpole).



After whatever happened at the bike racks with the police – an event that lasted at most 5-7 seconds – the Middletons retreated away from the police line, and into the safety of the crowd, even as an officer trying to reach for them.



In preparing this memorandum, undersigned counsel has had the disadvantage of not having been trial counsel in this case.  As a consequence, he has had to rely on the trial transcript, but, more importantly, on the video recordings provided in discovery. He has reviewed those videos over and over again to try to ascertain exactly what happened during those brief seconds.

He is aware that the police, who surely had no actual memory at the time they testified of those few seconds among the hours that they spent at the Capitol that day, claimed to recall this particular event enough to describe what happened between themselves and the Middletons.

The videos do show that at one point, Mrs. Middleton's scarf was being pulled by a police officer, and Mr. Middleton has testified that he tried to pull Mrs. Middleton away from the police line and to have the police let go of his wife.[2]

That is a natural reaction that any person would have, even if the two people hadn't been married for decades as the Middletons have.

With a certain degree of professional shame, counsel admits that before seeing the relevant videos, he speculated that Mr. Middletons' conviction under the assault statute must have been based on clear evidence of an assault on their part.  Despite Mr. and Mrs. Middletons' claims to counsel that the police assaulted them, however, counsel, who has represented criminal defendants for nearly four decades and has learned never to presume the guilt of any defendant, honestly thought that there must be clear evidence showing that the defendants somehow assaulted the police first.[3]

Counsel was wrong.

It was a shock, when counsel finally viewed the videos of the interaction between the police and the Middletons, to see that at the time the couple was huddled close together while praying, and standing feet away from the police and the bike racks separating the two groups, the police were actually in the process of organizing an action that resulted in at least a half dozen officers picking up bike racks and after multiple yells of "push, push, push!" rang out, literally shoving the racks into the crowd, including into

---

[2] Trial Transcript (hereinafter Tr.), 2/8/24, at page 195, lines 13-18.
[3] Counsel is well aware of the assault statute, and the fact that it defines assault not only in the violent sense, but in "non-assaultive" terms such as "impede" and "interfere."

the Middletons.  Again, before this action by the police, the Middletons are clearly seen in videos facing each other and standing feet away from the bike racks.[4]

There is no indication at all in any video recording that the Middletons intended to cross those bike racks, to attack any police officers, or to initiate any type of physical contact with the many officers on the other side of those barriers.  It is beyond dispute that the police initiated the contact with the Middletons and others.

Once the officers lifted the racks and shoved them into the crowd, including into the Middletons, several people in the crowd reacted, and it is frankly difficult to tell from the video recordings what Mr. and Mrs. Middleton did once they were assaulted.

The allegation is made that Mr. Middleton used a flag and flagpole he was carrying to poke at the police, but the video recordings that counsel has seen show a group of people, including the Middletons, carrying flags of different sizes, with Mr. Middleton carrying a small flag that could not harm a soul.

It appears clear from the video that others, and not Mr. Middleton, extended their flags towards the police line as the Middletons scrambled away to safety.

Counsel is aware that the police officers who were involved in this brief action claimed to remember, on the witness stand, what Mr. and Mrs. Middleton did.  But the actions depicted in various video recordings are hard to decipher given the number of people present, obstructions to one's view in most of the videos, and the speed with which the action unfolded.

---

[4] It is noteworthy that while the government's sentencing memorandum includes several photos of a part of the interaction between the police and the crowd, it completely omits pictures showing that the Middletons were minding their own business before law enforcement officers engaged in the conduct they did.

Again, though, the Middletons were not moving toward the police, or physically indicating any intent to do so, before the police pushed the bike racks into them.

This is not to say that the Middletons should have been where they were in the first place.  It is also not to say that the police did not have the right to, in some manner, move the crowd away from its location.  But the aggressiveness demonstrated by the police in this instance was not the finest example of police behavior, and ended up being counter-productive, as it inflamed passions in the crowd.

In the end, defendant submits that his sentence should take all of the foregoing into account, which is that, other than being somewhere where he shouldn't have been, his brief, unsolicited encounter with the police does not demand a sentence of incarceration.  And it certainly does not merit the shocking sentence the government seeks.

### *The Sentencing Guidelines*

Defendant hereby adopts, and incorporates by reference, the calculations and arguments presented in the sentencing memorandum filed by co-defendant Jalise Middleton.

### *Background*

Mr. Middleton is before this Court after having been convicted one count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3),  two counts of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. §§ 111(a)(1), Entering and Remaining in a Restricted Building or Grounds, in violation of 18 USC § 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of

18 USC § 1752(a)(2), Engaging in Physical Violence in a Restricted Building or Grounds , in violation of 18 USC § 1752(a)(4), Disorderly Conduct in the Capitol Grounds or Buildings, in violation of 40 USC § 5104(e)(2)(D), and one count of Act of Physical Violence, in violation of 40 U.S.C. 5104(e)(2)(F).

### *Analysis of Sentencing Factors*

As this Court knows, pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), not only are the United States Sentencing Guidelines no longer mandatory, but they are also not even presumptively reasonable. In determining an appropriate sentence, this Court must consider the factors delineated in 18 U.S.C. § 3553(a), and impose a sentence that:

1) reflects the seriousness of the crime;

2) promotes respect for the law;

3) provides just punishment;

4) deters criminal conduct;

5) protects the public from further crimes, and

6) provides the Defendant with any necessary educational or vocational training, medical care, or other correctional treatment.

In addition, this Court must also consider

1) the nature and circumstances of the offense;

2) the history and characteristics of the defendant;

3) the kinds of sentences available;

4) the sentencing range;

5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

6) the need to provide restitution to any victims of the offense.

### *The Proposed Sentence Would Reflect the Seriousness of the Crime*

Mr. Middleton's conduct, when viewed in context, was different, and less severe, than the actively assaultive behavior of many of the January 6 defendants who have been charged with assaulting officers that day.

For instance, many defendants physically punched officers.  Some sprayed officers in the face with an extreme irritant.  Others beat officers with objects.  Yet others choked, kicked, restrained, and otherwise assaulted officers.  Their actions were direct, and violent.

Mr. Middleton's actions, on the other hand, consisted of attempting to remove the arm of at least one officer from his wife's body and scarf so that she wouldn't be further touched.  He did not have any intent to hurt an officer, and he was not the initial aggressor.

Mr. Middleton should have left the premises when officers asked him and the others to leave, but that is a far cry from remaining on the premises or actively attempting to assault and/or injure any officer.  As such, the brief interaction he had while the police were apparently pulling on his wife's scarf (and perhaps her body) does not merit a sentence anywhere near what the government proposes.

Mr. Middleton, defendant submits, is not a man inclined to violence – at all.  He is not a big man and does not seek out physical confrontation with anyone.  While counsel realizes that the Court does not know much about Mr. Middleton, it should be made aware that he is person who has worked hard throughout his lifetime to make others' lives better.  He is someone who is thoughtful and considerate.  He is not a bully, a tough guy, or a man who wants to hurt another human being.  He's actually sensitive to people's pain, both physical and emotional.

Unlike some of the other folks who were at the Capitol that day, Mr. Middleton was not in a state of rage or prepared to do battle that day.  He went to the rally to support the former president and express his views about the election.  He did not wear body armor, camouflage clothing, or any other item indicating that he was prepared to fight anyone.

He and his wife were fearful of encountering others in the crowd who may seek to harm them as they were well aware of violent confrontations between Trump supporters and members of Antifa at other events.  But he did not want to fight anyone or cause any harm to anyone else.

In conclusion, he maintains that the sentence proposed by the government is wildly out of proportion to the event in which he was involved.  Because he and his wife have been on home confinement, without any violations, for years, he submits that a sentence of home confinement, followed by a period of supervised release or probation, would be appropriate in this case.

***The Proposed Sentence Must Also Promote Respect for the Law, Provide Just Punishment to Mr. Middleton, and Deter Criminal Conduct, both by him and by Others.***

Defendant submits that his arrest and convictions of two felonies already constitute a significant punishment to someone like him.  He will forever be a felon and will lose many rights because of those convictions.

The Middletons, like many others in this country, believed that the former president had been robbed of a rightfully earned victory in the presidential election.  Thus, when authorities decided that the former president had lost the election, he thought that this amounted to a "coup."

Regardless of his political beliefs, however, Mr. Middleton did not come to Washington, D.C. planning to protest violently, nor did he do so.  Unlike many others who broke windows and rummaged through the Capitol, he stayed outside with his wife.  He never approached the police in a confrontational way.  And he never intended to have any confrontation with the police whatsoever.  There can hardly be better proof of this than the fact that prior to the police pushing the bike racks into his body and the body of many others, he and his wife were actually hugging and holding each other and praying.

Those are not the actions of someone seeking to fight the police or otherwise interact with them in a hostile manner.

He has learned a very hard lesson as a result of his arrest and home confinement in this case, and the chances of his re-offending are absolutely nil.

Mr. Middleton realizes, of course, that this sentencing factor also requires that the Court consider the need to deter "others" from the type of conduct he engaged in.  And

that, often (at least in counsel's view) results in sentences that are harsher than if the defendant was merely being sentenced for his own actions, without the need to scare (i.e., deter through fear) other would-be criminals.

While this factor is in the statute, counsel has always considered it an unfortunate inclusion. While the concept of needing to deter others is understandable, it often results in a sentence that, rather than punish a defendant for his or her actions, seeks to "make an example" out of him by factoring in the *possible future* actions of other, completely unrelated (legally), people.

Briefly, counsel has seen time and time again over the course of 39 years, situations where at the time of sentencing, a courtroom is full of other persons who are accused of various crimes, and whose families are there in support. What has often happened is that a judge decided that she simply could not send a message to the broader community, including the others in that courtroom, that a person can "get away" with certain behavior by receiving a light sentence. As a result, the judge would impose a harsh(er) sentence.

If that same defendant had been sentenced in an empty courtroom, or in a situation where no one would learn of that particular sentence, he or she would receive a sentence that the court believed was appropriate, rather than one that took into account the need to "deter others."

Counsel has on quite a few occasions in the Superior Court, where many defendants await their hearings at the same time (unlike in federal court), asked the courtroom clerk to call his client's case last so that the above scenario did not unfold.

While it has resulted in counsel often having to wait many hours over the course of the years counsel has been practicing, that has been a small price for counsel to pay to save defendants from months or years of additional incarceration that would have resulted had other defendants and their families been present in the courtroom to witness such lighter (and in counsel's view, fairer) sentences.

In any event, in the case of Mr. Middleton, defendant submits that anyone who knew all the facts of his case, including his spotless background, his employment record, and the unique circumstances of his case (the fact that he was protecting his wife, praying with her while huddling and holding her, and having their praying interrupted by police officers who violently initiated contact with them) would view the proposed sentence of home confinement, followed by a period of supervised release or probation, to be a fair resolution.

Any such person the Court may wish to deter would certainly not want to go through everything Mr. Middleton has gone through in this case, considering his actions.

For these reasons, defendant submits that the proposed sentence would accomplish the foregoing goals.

### *The Need to Protect the Public from Further Crimes*.

As noted above, there is absolutely no need to protect the public from any further crimes by Mr. Middleton.  He has learned a very hard lesson and is never going to re-offend.

### *The Court's Duty to Provide the Defendant with any Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment*.

Mr. Middleton is not in need of any such services.

### *The Need to Avoid Unwarranted Disparities*

In his efforts to find truly comparable cases, defense counsel has literally reviewed every single conviction, whether by trial or by plea, of defendants found guilty of a so-called "111(a)" charge.  Counsel must say that it has not been an easy task to find an "assault" that mirrors or parallels the actions of Mr. Middleton on January 6, 2021.  The vast majority of assaults that resulted in convictions were "true" assaults where defendants punched, kicked, hit, choked, sprayed, or otherwise actually tried to physically harm a police officer.

The following examples, involving conduct that is still ***much more severe*** than what this Court must punish in Mr. Middleton's case, at least give the Court some idea of the kinds of sentences that are being imposed in true assault cases.

<u>United States v. Mark Leffingwell</u>

Mark Leffingwell (21-CR-5-ABJ) pled guilty to assaulting a police officer (a "111" charge) in connection with January 6.  In Mr. Leffingwell's case, he *actually* assaulted a police officer – in fact, two police officers.  As the government noted in its sentencing memorandum in that case, not only did Leffingwell actually strike two police officers *in the head*, no less, he also encouraged officers to join him and other rioters in their attempts to take the Capitol.

What makes Leffingwell's case even more galling is the fact that he was a military veteran, a disabled military veteran at that.  Yet he chose to try to overthrow the

government on January 6, 2021, the very government he had sworn to protect from all enemies, foreign and domestic.

For this conduct, Mr. Leffingwell was sentenced to **six months** in prison although he struck two police officers and tried to convince the police to turn against their own government.

<u>United States v. Barton Shively, 21-CR-151(JMC)</u>

Barton Shively pled guilty to two counts of assault under 18 U.S.C. §111(a)(1).

On January 6, 2021, Mr. Shively walked over barricades that had been knocked down by others, and grabbed a police officer by the officer's jacket, yelling at that officer.  He then struck a second officer in the officer's hand, head, and shoulder area. He then attacked *still more* officers, hitting one in the head with the officer's own baton, and kicking another officer with his (Shively's) boot.

After the attack, Shively gave a public news interview praising what the rioters had done that day.

For his actions, as this Court knows, Mr. Shively was sentenced to *18 months* in prison on each count, to run concurrently, followed by three years of supervised release.

<u>United States v. Matthew Ryan Miller, 21-CR-75(RDM)</u>

Matthew Ryan Miller entered guilty pleas to one count of Obstruction of an Official Proceeding (a so-called "1512" charge) and one count of Assault (a "111") charge.

In his Statement of Offense ("SOF"), Mr. Miller admitted that he had posted a picture of himself on Instagram at the rally.

Mr. Miller then used a section of the temporary barriers used by the U.S. Capitol Police as a ladder to scale the walls of the west side of the Capitol plaza. He also assisted others who were scaling the wall and other architectural objects.  *SOF*, at 4.

When he was at the lower west terrace, he "waved his hand, and said multiple times, 'come on' as the mob chanted 'heave ho' and rocked back and forth in a push towards the tunnel entrance…."  Multiple times, Mr. Miller "put up his fingers and yelled 'one, two, three, push!'"  *Id*.

The Statement of Offense also states that Mr. Miller, "[f]rom this position … threw a few unidentifiable objects towards the … tunnel where law enforcement officers were attempting to secure the U.S. Capitol."  *Id*.

Finally, when Mr. Miller was closest to the tunnel, he used a fire extinguisher to spray into the tunnel where many law enforcement officers were pushing back against rioters.  He therefore affected much more than one officer with the chemical contained in the fire extinguisher, and his actions actually caused direct contact with these officers – contact that was painful and lasting.

For his actions, including incitement to violence, he received a sentence of **33 months** in prison on each count, to run concurrently, and 24 months of supervised release.

Mr. Middleton's actions come nowhere close to what Mr. Miller did that day, and because of that, his sentence should not come close to Miller's sentence.

United States v. Logan Barnhart, 21-CR-35(RC)

On January 6, 2021, Logan Barnhart and others attacked a line of police officers and knocked them to the ground.  During this attack, Barnhart grabbed an officer's neck and torso (apparently by grabbing his clothing) and dragged him over the body of another police officer and down a set of stairs where the officer was further attacked with weapons, including a flagpole and a baton.  The officer sustained physical injuries.

Shortly thereafter, Barnhart returned to the police line and joined others in charging against that line.  He then wielded a flagpole and used it to strike several more officers.

For all of that, Mr. Barnhart received a prison sentence of **36 months** followed by 36 months of supervised release (and other minor sanctions).

Again, Mr. Middleton's conduct bears no resemblance to the actions of Mr. Barnhart.

The government cites other cases where defendants received very lengthy sentences, but none of those cases is truly comparable to the instant case and should not be used as comparators when deciding on an appropriate sentence.

<u>Summary of Comparable Cases</u>

Mr. Middleton could go on and on discussing other "111" cases that demonstrate the range of sentences judges have typically imposed in these circumstances.  It is notable, however, that these cases all involved actual physical assault on the body of a police officer, rather than the merely pushing against a bike rack, or attempting to protect one's wife from aggressive police officers.

Defendants who actually attempted to harm officers by punching, kicking, pulling, grabbing, spraying, or otherwise physically contacting officers in a brutal manner should receive harsher sentences. But that is not what Mr. Middleton did here at all.

### *Conclusion*

It is extremely telling that the government, in its memorandum,[5] states that "[a]fter all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is 'only one of several factors that must be weighted and balanced,' and the degree of weight is 'firmly committed to the discretion of the sentencing judge.' *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012)."

This sentence is obviously included in its memorandum because it realizes that sentences imposed in many other 111(a) cases have been vastly lower than the sentence the government recommends here. In fact, the government's recommendation here is shocking.

While defendant submits that even that sentence recommendation is too high, at least the recommendation made by the probation office – 36 months in prison - is not so far out of the heartland of sentences imposed as to be irrational.

Defendant asks this Court, after a careful consideration of all of the arguments presented herein, to impose a sentence of one year of home confinement, followed by a period of supervised release or probation. This, he submits, would be just and fair, and

---

[5] *Gov't Sent Memo*, at 48.

sufficient, but not greater than necessary, to adequately punish him for his conduct, and

accomplish all of the goals set out in the sentencing statute.

Respectfully submitted,

/s/

Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
E-mail:  sfbrennwald@cs.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by ECF, this 18th day of
September, 2024, to all counsel of record.

/s/

Stephen F. Brennwald